# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COLLINS & AIKMAN CORPORATION, et al.[1] | ) Case No. 05-55927 (SWR) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) (Tax Identification #13-3489233) |
| | ) |
| COLLINS & AIKMAN PRODUCTS CO. | ) |
| Plaintiff, | ) Honorable Steven W. Rhodes |
| | ) |
| v. | ) Adv. Proc. No. 06-_____ |
| | ) |
| GENERAL ELECTRIC CAPITAL | ) |
| CORPORATION | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Collins & Aikman Products Co. ("C&A" or the "Plaintiff"), as a debtor

and debtor in possession, for its adversary complaint against General Electric

Capital Corporation ("GECC" or the "Defendant"), alleges as follows.

---

[1]    The Debtors in the jointly administered cases include:  Collins & Aikman Corporation; Amco Convertible Fabrics, Inc., Case No. 05-55949; Becker Group, LLC (d/b/a/ Collins & Aikman Premier Mold), Case No. 05-55977; Brut Plastics, Inc., Case No. 05-55957; Collins & Aikman (Gibraltar) Limited, Case No. 05-55989; Collins & Aikman Accessory Mats, Inc. (f/k/a the Akro Corporation), Case No. 05-55952; Collins & Aikman Asset Services, Inc., Case No. 05-55959; Collins & Aikman Automotive (Argentina), Inc. (f/k/a Textron Automotive (Argentina), Inc.), Case No. 05-55965; Collins & Aikman Automotive (Asia), Inc. (f/k/a Textron Automotive (Asia), Inc.), Case No. 05-55991; Collins & Aikman Automotive Exteriors, Inc. (f/k/a Textron Automotive Exteriors, Inc.), Case No. 05-55958; Collins & Aikman Automotive Interiors, Inc. (f/k/a Textron Automotive Interiors, Inc.), Case No. 05-55956; Collins & Aikman Automotive International, Inc., Case No. 05-55980; Collins & Aikman Automotive International Services, Inc. (f/k/a Textron Automotive International Services, Inc.), Case No. 05-55985; Collins & Aikman Automotive Mats, LLC, Case No. 05-55969; Collins & Aikman Automotive Overseas Investment, Inc. (f/k/a Textron Automotive Overseas Investment, Inc.), Case No. 05-55978; Collins & Aikman Automotive Services, LLC, Case No. 05-55981; Collins & Aikman Canada Domestic Holding Company, Case No. 05-55930; Collins & Aikman Carpet & Acoustics (MI), Inc., Case No. 05-55982; Collins & Aikman Carpet & Acoustics (TN), Inc., Case No. 05-55984; Collins & Aikman Development Company, Case No. 05-55943; Collins & Aikman Europe, Inc., Case No. 05-55971; Collins & Aikman Fabrics, Inc. (d/b/a Joan Automotive Industries, Inc.), Case No. 05-55963; Collins & Aikman Intellimold, Inc. (d/b/a M&C Advanced Processes, Inc.), Case No. 05-55976; Collins & Aikman Interiors, Inc., Case No. 05-55970; Collins & Aikman International Corporation, Case No. 05-55951; Collins & Aikman Plastics, Inc., Case No. 05-55960; Collins & Aikman Products Co., Case No. 05-55932; Collins & Aikman Properties, Inc., Case No. 05-55964; Comet Acoustics, Inc., Case No. 05-55972; CW Management Corporation, Case No. 05-55979; Dura Convertible Systems, Inc., Case No. 05-55942; Gamble Development Company, Case No. 05-55974; JPS Automotive, Inc. (d/b/a PACJ, Inc.), Case No. 05-55935; New Baltimore Holdings, LLC, Case No. 05-55992; Owosso Thermal Forming, LLC, Case No. 05-55946; Southwest Laminates, Inc. (d/b/a Southwest Fabric Laminators Inc.), Case No. 05-55948; Wickes Asset Management, Inc., Case No. 05-55962; and Wickes Manufacturing Company, Case No. 05-55968.

## Jurisdiction and Venue

1.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157, 1334 and 2201 and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2.      This action is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for relief sought herein are sections 105, 365, 502 and 506 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), Bankruptcy Rule 7001(1), (2) and (9) and 28 U.S.C. § 2201.

## Description of the Parties

5.      The Plaintiff is one of the debtors in the above-captioned chapter 11 cases and is a Delaware corporation. The Plaintiff's headquarters are located at 250 Stephenson Highway, Troy, Michigan, 48083.

6.      On May 17, 2005 (the "Petition Date"), the Plaintiff, the Plaintiff's parent and certain of the Plaintiff's subsidiaries (collectively, the "Debtors" or the "Company") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      Upon information and belief, GECC is a Delaware corporation having its principal place of business in Stamford, Connecticut.

## Nature of the Action

8.      In this action for declaratory judgment, the Plaintiff seeks (a) recharacterization of three so-called Master Lease Agreements entered into pursuant to a

2

series of "sale/leaseback" transactions between the Plaintiff and the Defendant and (b) a declaration from the Court that the "Master Lease Agreements" are in fact disguised secured financing transactions.

## Facts

### *The Textron Acquisition: The Phase I and Phase II Agreements*

9.    Sometime in late 2000 or early 2001, Heartland Industrial Partners, L.P. ("Heartland") assumed management of the Company, developed an expansion plan for its businesses and began investigating targets for acquisition. Heartland began implementing its expansion plan for the Company and led the Company in consummating multiple acquisitions that substantially expanded the Company's operations and revenues. The acquisitions were financed through incurring debt and issuing equity.

10.    In 2001, the Company consummated four major acquisitions that more than doubled the Company's sales over the previous year. Specifically, in June 2001, the Company acquired Becker Group L.L.C., a leading supplier of plastic components to the automotive industry. In September 2001, the Company acquired Joan Automotive Fabrics, a leading supplier of body cloth to the automotive industry. The Company also acquired Joan's affiliated yarn dyeing operation, Western Avenue Dyers, L.P.

11.    The next significant acquisition, and by far the largest, was consummated in December 2001. In that transaction, the Company purchased a division of Textron, Inc. known as "TAC-Trim."

12.    To finance the TAC-Trim acquisition and refinance debt incurred in connection with the other acquisitions, Heartland negotiated a Credit Agreement dated December 20, 2001 pursuant to which the Company could borrow funds in accordance with the terms of the

agreement to consummate the acquisition, fund the transition period and otherwise finance its operations.

13.     Because of certain prepayment conditions in the Credit Agreement, however, the Company was required to secure additional, substantial financing to enable it to close the TAC-Trim acquisition.

14.     Obtaining the additional financing proved extremely difficult because most of the Company's assets were either already mortgaged as a result of the multiple acquisitions or were pledged as collateral under the Credit Agreement.  Thus, the Company's excess or "free" assets were insufficient to secure the additional financing necessary to acquire TAC-Trim.

15.     To overcome the shortfall in assets and other credit issues, Heartland approached the Defendant and requested that it finance the balance of the funds necessary to consummate the TAC-Trim acquisition.

16.     Because the Company's excess assets were insufficient to support the requested financing on a traditional basis, the parties discussed financing in the form of a "sale/leaseback" transaction.

17.     Specifically, the Defendant proposed to finance $60 million over a period of a year and a half with an initial repayment term of six years.  The Defendant, however, would only fund the first $10 million and then arrange a syndicate of lenders to finance the $50 million balance (the "Financing Proposal").  In addition, although the Financing Proposal stated that the Defendant would be considered the owner for federal income tax purposes, all of the burdens and risks of ownership were to remain with C&A.

4

18. The Financing Proposal also contained additional traditional secured financing terms such as cross-collateralization and cross-default provisions and even a utilization fee that would require C&A to pay certain fees in the event it did not use a minimum amount of the available borrowings.

19. The Financing Proposal did not identify any specific equipment to be "purchased" by GECC and "leased" back to C&A. Instead, C&A would determine the amount it needed under a particular draw, identify particular items or groupings of equipment it believed would support the draw amount and the Defendant would then "purchase" the equipment in the amount of the draw and "lease" it back to C&A.

20. The negotiations with the Defendant culminated in a financing that occurred in three phases in the form of three purported sale/leaseback transactions, the first of which occurred prior to the TAC-Trim closing, the second of which was concurrent with the closing of the TAC-Trim acquisition and the Credit Agreement and the third of which occurred two-and-a-half years thereafter.

*The Phase I and Phase II Agreements*

21. On August 7, 2001, C&A entered into the TAC-Trim purchase agreement. Also on August 7, 2001, C&A and GECC entered into what was entitled a "Master Lease Agreement" pursuant to which GECC funded the first phase of the financing (the "Phase I Agreement").

22. After execution of the TAC-Trim purchase agreement and the Phase I Agreement and during the continued negotiations of the Credit Agreement, it became apparent that C&A would require additional financing to close the Credit Agreement and the TAC-Trim purchase agreement. Thus, C&A and GECC entered into a second "Master Lease Agreement"

5

dated December 20, 2001 pursuant to which GECC funded the second phase of the financing (the "Phase II Agreement").

23. All parties, including GECC and the Company's senior lenders, understood, agreed and intended that the funds borrowed under the Phase I and II Agreements were to be used to subsidize the financing of the TAC-Trim acquisition and to enable the closing of the acquisition and the Credit Agreement. The closing of the TAC-Trim acquisition, the Credit Agreement and the Phase II Agreement were concurrent.

24. The Phase I and II Agreements provided for the sale to the Defendant and the leaseback to C&A of equipment owned by C&A. C&A retained possession of the equipment at all times. The Defendant purchased the equipment from C&A with the express intention of leasing the equipment back to C&A and had no other use or purpose for the equipment.

25. The "purchase price" of the equipment under the Phase I Agreement, which the parties agreed was to equal the "fair market value-removal,"[2] was approximately $24,385,696. The actual fair market value-removal of the "purchased" equipment was approximately $8,309,200.

26. The stream of "lease payments" under the Phase I Agreement (exclusive of taxes, insurance, fees and other substantial costs and obligations) total in the aggregate $32,288,662 or 132.4% of the "purchase price" of the "leased" equipment.

27. The "purchase price" of the equipment under the Phase II Agreement, which the parties agreed was to equal the fair market value-removal, was approximately

---

[2] "Fair market value-removal" means the amount a willing buyer would pay for the machinery and equipment when it would be the buyer's responsibility to pay the costs associated with disassembling, transporting and reinstalling the assets purchased at another location, and assumes that neither the buyer nor the seller is under any compulsion to buy or sell and that there is no limiting time frame for completion of the transaction.

K&E 11095304.1

$23,086,054. The actual fair market value-removal of the "purchased" equipment was $4,142,615.

28. The stream of "lease payments" under the Phase II Agreement (exclusive of taxes, insurance, fees and other substantial costs and obligations of C&A) total in the aggregate $30,658,280 or 132.8% of the "purchase price" of the "leased" equipment.

29. Under each of the Phase I and II Agreements, C&A's parent, Collins & Aikman Corporation, was required to cause C&A or a subsidiary of C&A to act as purchaser of TAC-Trim upon the Company's acquisition of TAC-Trim.

30. Under each of the Phase I and II Agreements, C&A's failure to consummate the TAC-Trim acquisition was an incurable default.

31. If C&A did not acquire TAC-Trim, all amounts owed under the Phase I and II Agreements would become immediately due and payable in the form of "liquidated damages." The liquidated damages clause is in substance nothing other than a debt acceleration clause.

32. In the event the TAC-Trim acquisition did not close, however, neither the Defendant nor C&A had any intention or expectation that the Defendant would take possession of the equipment under the Phase I and II Agreements **unless and until** C&A was unable to re-pay the amounts borrowed from the Defendant under the agreements.

33. Indeed, with respect to the Phase II Agreement, the funding was simultaneous with the closing of the TAC-Trim acquisition and the Credit Agreement. Thus, had the acquisition not taken place, and by the very terms of the Phase II Agreement, GECC would never have "purchased" the equipment under that agreement much less expected to ever take possession of the equipment. Clearly, GECC had no interest in or intention of "buying" C&A's

equipment for any current or future use or purpose. The equipment was merely intended to secure C&A's borrowings under the Phase I and II Agreements.

34.     And, if the Defendant were to take possession of the equipment because the acquisition failed to close, GECC would have lost tens of millions of dollars as the equipment was worth less than a third of the "purchase price" GECC paid for it. Furthermore, C&A's operations would have been effectively shut down (because of the nature and critical grouping of the "leased" equipment) and C&A would have been utterly unable to re-pay the loans.

35.     Because of GECC's substantially undersecured position, GECC required the Company to execute secured guarantees and pledge additional collateral beyond the "leased" equipment to secure the guarantees. Moreover, GECC required C&A to post letters of credit to further support the credit GECC advanced under the agreements.

*Post-Acquisition:  The Phase III Agreement*

36.     In 2002 and 2003, Heartland continued implementing its acquisition plan. Specifically, the Company purchased two additional entities and a 50% interest in a third entity.

37.     As a result of the impact of the debt incurred to fund the acquisitions as well as changes in market conditions and because the Company did not realize the benefits of the acquisitions as quickly as anticipated, the Company began experiencing serious financial problems in 2004. To combat these problems and because the Company was not able to obtain additional financing from its senior lenders, the Company began investigating all available means to generate cash to see the Company through its post-acquisition transition period.

38.     Once again, Heartland approached the Defendant to provide financing to C&A. And, once again, the Defendant structured the financing as a sale/leaseback transaction.

8

39.     Specifically, C&A and GECC entered into a third agreement entitled "Master Lease Agreement," dated June 25, 2004 pursuant to which GECC funded the third phase of the financing to C&A (the "Phase III Agreement") and which provided for the sale to the Defendant and the leaseback to C&A of equipment owned by C&A. C&A retained possession of the equipment at all times as well as all of the risks and burdens of ownership of the equipment. The Defendant purchased the equipment from C&A with the express intention of leasing the equipment back to C&A and had no other use for the equipment.

40.     The "purchase price" of the equipment under the Phase III Agreement, which the parties agreed was to equal the fair market value-removal, was approximately $19,761,544. The actual fair market value-removal of the "purchased" equipment was approximately $6,094,410.

41.     The stream of "lease payments" under the Phase III Agreement (exclusive of taxes, insurance, fees and other substantial costs and obligations) total in the aggregate $24,488,551 or 123.9% of the "purchase price" of the "leased" equipment.

**Allegations Common to All Equipment Leases**

42.     The Phase I Agreement, the Phase II Agreement and the Phase III Agreement are collectively referred to as the "Equipment Agreements" and are attached as **Exhibit A**, **Exhibit B** and **Exhibit C**, respectively.

43.     Under each of the Equipment Agreements and notwithstanding the purported "sale" of equipment to the Defendant, C&A retained all of the burdens and risks of ownership.

44.     In addition, because of the nature and groupings of equipment captured under the sale/leaseback transactions and the cross-default provisions as well as other terms

9

under the Equipment Agreements, if C&A were to default under any of the agreements, the Defendant had the power to effectively shut down C&A's operations.

45.     Under each of the Equipment Agreements, C&A was required to post a letter of credit to secure performance of its obligations.

46.     Under each of the Equipment Agreements, C&A was required to procure a secured guaranty from the Company guaranteeing C&A's obligations under the Equipment Agreements and transferring additional collateral to GECC not subject to the Equipment Agreements to secure performance of the guaranty. The guarantees from Collins & Aikman Plastics, Ltd. and the guarantees from Collins & Aikman Canada Inc. are attached as **Exhibit D-1 through D-3** and **Exhibit E-1 through E-3**, respectively.

47.     Under each of the Equipment Agreements, C&A was required to pay an "Up Front Fee" equal to 1.25% of the amount of the borrowing under the agreement.

48.     Under each of the Equipment Agreements, C&A was required to pay a $30,000 "Amendment Fee" for certain amendments (which were essentially equipment additions) to become effective.

49.     Under each of the Equipment Agreements, C&A was required to pay a $5,000 "Relocation Fee" for any re-location of an item of equipment.

50.     Under each of the Equipment Agreements, C&A was required to pay a $5,000 "Substitution Fee" for any item of equipment it replaced which replacement was required to be of like kind and like value.

51.     Under each of the Equipment Agreements, C&A was required to pay the Defendant a fee any time it was required to pay a fee to its senior lenders in connection with any waiver under or amendment to the Credit Agreement, which fee was to be calculated on the same

K&E 11095304.1

basis as the fee to be paid to the lenders. If the fee at issue was to be calculated based on the then outstanding indebtedness under the Credit Agreement, GECC's fee was to be calculated based on the "purchase price" GECC paid for the equipment under the agreements.

52.     These fees were in substance additional financing charges.

53.     Under each of the Equipment Agreements, C&A was required to pay GECC, in the form of "additional rent," a specified "Net Economic Return" in the event tax laws changed such that GECC would be required to reduce or return any portion of the tax benefits it was to receive under the agreements.

54.     Under each of the Equipment Agreements, C&A, to exercise its limited right to terminate the agreement with respect to equipment that had become obsolete, was required to sell the equipment at its own cost, pay over the proceeds of the sale to GECC and then pay additional amounts equal to a "Stipulated Loss Value" that was nothing more than a calculation of the remaining "Rent" due under the agreement for a particular item or items of equipment. Upon payment of the balance of the Rent, i.e. the Stipulated Loss Value, the agreement was deemed terminated with respect to the item or items of equipment and, obviously, having been sold, C&A had no obligation to turn over the item or items of equipment to GECC. Nor did C&A have any obligation to pay any additional amounts beyond the "Rent" (other than any costs GECC may have incurred in connection with sale) for the agreement to terminate with respect to the sold equipment.

55.     The Stipulated Loss Value of each piece of equipment under the agreements was nothing more than the portion of the amortized loan balance allocated to such piece of equipment and had no meaningful relationship to the fair market rental or sale value of any piece of equipment.

K&E 11095304.1

56.     Without a doubt, GECC was looking only to the "Rent" to be received under the agreements and at no time did GECC have any credible interest in ever taking possession of the "leased" equipment at the end of the respective "lease" term.

57.     Indeed, because of the true value of the equipment and the millions of dollars it would cost to de-install, remove and transport the equipment, the only circumstance in which it would make **any** economic sense for GECC to take possession of the equipment would be if C&A were to shut down its operations and liquidate its property.  And, such circumstance was the **only** circumstance in which GECC or C&A ever contemplated that GECC would in fact take possession of the equipment.

58.     Under each of the Equipment Agreements, C&A was required to pay "liquidated damages" in an amount equal to the Stipulated Loss Value (i.e. a lump sum equal to the remaining "rent" due under the agreement) of all of the equipment under the agreement in the event of default.  The liquidated damages provision was in substance a disguised debt acceleration clause crafted to accelerate the maturity of the amortized balance of the credit GECC advanced under each of the agreements.

59.     Under each of the Equipment Agreements, a default under one agreement was a default under all of the agreements.

60.     Under each of the Equipment Agreements, a default under the Credit Agreement was a default under all of the agreements.

61.     Under each of the Equipment Agreements, a default under **any** agreement between GECC and C&A or any C&A subsidiary or affiliate was a default under all of the agreements.

62.     Thus, GECC effectively "secured" its substantially undersecured loans by tying most, if not all, of C&A's (and the Company's) essential contractual agreements to the Equipment Agreements.[3] And, because GECC knew that C&A could not effectively operate without, or replace, the "leased" equipment without dramatically disrupting, perhaps even destroying, its businesses, GECC gained tremendous leverage and advantage over C&A's and the Company's other creditors.

63.     Put simply, GECC agreed to make a substantially undersecured loan to C&A because, by disguising the loan as a leasing transaction, GECC was able to, in effect, obtain a "super-priority" position over C&A's other creditors with respect to all of C&A's (and the Company's) assets without actually having obtained security interests in any such assets beyond the "leased" equipment.

64.     The current fair market value "in place" or "installed"[4] of the "leased" equipment is approximately $21 million and the remaining rent payments (exclusive of taxes, insurance, fees and other substantial costs and obligations of C&A) due under the Equipment Agreements is approximately $52 million.

65.     Fair market value in place or installed is the **highest** value potentially obtainable by GECC for the equipment.  The **only** entity from which GECC could obtain this value is C&A.

66.     Since the Petition Date, C&A has paid nearly $9 million in "rent" and other obligations under the Equipment Agreements.

---

[3]     For example, and in addition to the Credit Agreement and other critical agreements, the Company through a wholly-owned subsidiary had a pre-petition accounts receivable securitization facility under which GECC was the agent and sole lender.

[4]     Fair market value "in place" or "installed" means the amount for which a willing buyer would purchase the equipment when the seller is responsible for all of the costs of installation.

13

67.     A substantial, real, legal and immediate controversy exists between the Plaintiff and the Defendant as to whether the Equipment Agreements are security interests or true leases.

68.     The legal interests of the Plaintiff and the Defendant regarding this controversy are adverse.

69.     The issue of whether the Equipment Agreements are secured financings or true leases is ripe for adjudication.

70.     Whether a lease is in substance a secured financing that creates a security interest or is a "true lease" is a matter of state law.

## Count I
## Action for Declaratory Judgment on the Phase I Agreement

71.     The Plaintiff restates and incorporates the allegations in paragraphs 1 through 70.

72.     New York law governs the Phase I Agreement.

73.     The Phase I Agreement is a non-cancelable agreement for the entire term of the Phase I Agreement and is not subject to termination by the Plaintiff.

74.     The consideration the Plaintiff is required to pay under the Phase I Agreement is an obligation for the term of the Phase I Agreement.

75.     The Plaintiff's obligation to pay "rent" and all other amounts due under the Phase I Agreement are absolute and unconditional and is not subject to any reductions, abatement or set-offs.

76.     Upon information and belief, at the time the Phase I Agreement was executed by the Plaintiff and GECC, the original term of the Phase I Agreement equaled or

exceeded the remaining economic life and/or the remaining useful life of the equipment subject to the Phase I Agreement (the "Phase I Equipment").

77.    The terms of the Phase I Agreement grant the Plaintiff the option to become the owner of the Phase I Equipment for nominal additional consideration upon the expiration of the initial term of the Phase I Agreement.

78.    The aggregate rental payments required to be paid by the Plaintiff over the term of the Phase I Agreement exceed the original purchase price of the Phase I Equipment.

79.    The Phase I Agreement requires the Plaintiff to pay all taxes, fees and assessments due, imposed, assessed or levied on the Phase I Equipment or on the ownership, delivery, leasing, possession, use or operation of the Phase I Equipment for the term of the Phase I Agreement including all license and registration fees, and all sales, use, personal property, excise, gross receipts, value added, franchise, stamp or other taxes, imposts, duties and charges, and any penalties, fines or interest thereon.

80.    The Phase I Agreement requires the Plaintiff to maintain "All Risk Property Insurance" with coverage in the greater of the then current Stipulated Loss Value, i.e. an amount equal to the remaining "rent" under the agreement, or replacement cost value in an amount acceptable to GECC, "Business Interruption Insurance," "Comprehensive General Liability Insurance," "Workers' Compensation/Employer's Liability" insurance and "Excess/Umbrella Liability" insurance in accordance with the amounts and terms set forth in the Phase I Agreement.

81.    The Phase I Agreement requires the Plaintiff to bear all risks of any loss, theft, damage to, or destruction of the Phase I Equipment from any cause and the occurrence of

K&E 11095304.1

any loss, theft, damage, loss of possession, use or destruction of the Phase I Equipment shall not relieve the Plaintiff of any obligation under the Phase I Agreement.

82.     The Phase I Agreement requires the Plaintiff to indemnify GECC against, and hold harmless from, any and all claims, actions, suits proceedings, costs, expenses, damages and liabilities, arising out of, connected with, or resulting from the Phase I Agreement and the Phase I Equipment.

83.     The Phase I Agreement disclaims all of GECC's warranties, express or implied, including, but not limited to, warranties of merchantability or fitness for a particular purpose or otherwise.

84.     The Phase I Agreement requires the Plaintiff to bear all costs relating to any searches undertaken by GECC, or any filing, recording, stamp fees or taxes arising from the filing or recording of any such instrument or statement.

85.     The Phase I Agreement requires the Plaintiff, at its sole expense, to maintain, service, test and inspect each unit of the Phase I Equipment and keep it in good operating order, repair, condition and appearance in accordance with the manufacturer's recommendation, normal wear and tear excepted.

86.     The economic realities of the terms of the Phase I Agreement are that GECC does not retain any meaningful residual interest in the Phase I Equipment upon the expiration of the original term of the Phase I Agreement.

87.     At the inception of the Phase I Agreement, GECC had no meaningful expectation that it would ever take possession of the Phase I Equipment upon expiration of the term of the Phase I Agreement.

K&E 11095304.1

88. The terms and obligations of the Phase I Agreement and the nature of the equipment covered by the agreement economically compel the Plaintiff to purchase the Phase I Equipment.

89. The Phase I Agreement is a financing agreement that creates a security interest and not a true lease.

**Count II**
**Action for Declaratory Judgment on the Phase II Agreement**

90. The Plaintiff restates and incorporates the allegations in paragraphs 1 through 70.

91. New York law governs the Phase II Agreement.

92. The Phase II Agreement is a non-cancelable agreement for its entire term and is not subject to termination by the Plaintiff.

93. The consideration the Plaintiff is required to pay under the Phase II Agreement is an obligation for the term of the Phase II Agreement.

94. The Plaintiff's obligation to pay "rent" and all other amounts due under the Phase II Agreement are absolute and unconditional and is not subject to any reductions, abatement or set-offs.

95. Upon information and belief, at the time the Phase II Agreements were executed by the Plaintiff and GECC, the original term of the Phase II Agreement equaled or exceeded the remaining economic life and/or the remaining useful life of the equipment covered by the Phase II Agreements (the "Phase II Equipment").

96. The terms of the Phase II Agreements grant the Plaintiff the option to become the owner of the Phase II Equipment for nominal additional consideration upon the expiration of the initial term of the Phase II Agreement.

K&E 11095304.1

97.     The aggregate rental payments required to be paid by the Plaintiff over the term of the Phase II Agreement exceed the original purchase price of the Phase II Equipment.

98.     The Phase II Agreement requires the Plaintiff to pay all taxes, fees and assessments due, imposed, assessed or levied on the Phase II Equipment or on the ownership, delivery, leasing, possession, use or operation of the Phase II Equipment for the term of the Phase II Agreement including all license and registration fees, and all sales, use, personal property, excise, gross receipts, value added, franchise, stamp or other taxes, imposts, duties and charges, and any penalties, fines or interest thereon.

99.     The Phase II Agreement requires the Plaintiff to maintain "All Risk Property Insurance" with coverage in the greater of the then current Stipulated Loss Value, i.e. an amount equal to the remaining "rent" under the agreement, or replacement cost value in an amount acceptable to GECC, "Business Interruption Insurance," "Comprehensive General Liability Insurance," "Workers' Compensation/Employer's Liability" insurance and "Excess/Umbrella Liability" insurance in accordance with the amounts and terms set forth in the Phase II Agreement.

100.    The Phase II Agreement requires the Plaintiff to bear all risks of any loss, theft, damage to, or destruction of the Phase II Equipment from any cause and the occurrence of any loss, theft, damage, loss of possession, use or destruction of the Phase II Equipment shall not relieve the Plaintiff of any obligation under the Phase II Agreement.

101.    The Phase II Agreement requires the Plaintiff to indemnify GECC against, and hold harmless from, any and all claims, actions, suits proceedings, costs, expenses, damages and liabilities, arising out of, connected with, or resulting from the Phase II Agreement and the Phase II Equipment.

K&E 11095304.1

102.    The Phase II Agreement disclaims all of GECC's warranties, express or implied, including, but not limited to, warranties of merchantability or fitness for a particular purpose or otherwise.

103.    The Phase II Agreement requires the Plaintiff to bear all costs relating to any searches undertaken by GECC, or any filing, recording, stamp fees or taxes arising from the filing or recording of any such instrument or statement.

104.    The Phase II Agreement requires the Plaintiff, at its sole expense, to maintain, service, test and inspect each unit of the Phase II Equipment and keep it in good operating order, repair, condition and appearance in accordance with the manufacturer's recommendation, normal wear and tear excepted.

105.    The economic realities of the terms of the Phase II Agreement are that the GECC does not retain any meaningful residual interest in the Phase II Equipment upon the expiration of the original term of the Phase II Agreement.

106.    At the inception of each of the Phase II Agreements, GECC did not have a meaningful expectation that it would ever take possession of the Phase II Equipment upon expiration of the term of the Phase II Agreement.

107.    The terms and obligations of the Phase II Agreement and the nature of the equipment covered by the agreement economically compel the Plaintiff to purchase the Phase II Equipment.

108.    The Phase II Agreement is a financing agreement that creates a security interest and not a true lease.

**Count III**
**Action for Declaratory Judgment on the Phase III Agreement**

109. The Plaintiff restates and incorporates the allegations in paragraphs 1 through 70.

110. New York law governs the Phase III Agreement.

111. The Phase III Agreement is a non-cancelable agreement for its entire term and is not subject to termination by the Plaintiff.

112. The consideration the Plaintiff is required to pay under the Phase III Agreement is an obligation for its entire term.

113. The Plaintiff's obligation to pay "rent" and all other amounts due under the Phase III Agreement are absolute and unconditional and is not subject to any reductions, abatement or set-offs.

114. Upon information and belief, at the time the Phase III Agreement was executed by the Plaintiff and GECC, the original term of the Phase III Agreement equaled or exceeded the remaining economic life and/or the remaining useful life of the equipment covered by the Phase III Agreement (the "Phase III Equipment").

115. The terms of the Phase III Agreement grant the Plaintiff the option to become the owner of the Phase III Equipment for nominal additional consideration upon the expiration of the term of the Phase III Agreement.

116. The aggregate rental payments required to be paid by the Plaintiff over the term of the Phase III Agreement exceed the original purchase price of the Phase III Equipment.

117. The Phase III Agreement requires the Plaintiff to pay all taxes, fees and assessments due, imposed, assessed or levied on the Phase III Equipment or on the ownership, delivery, leasing, possession, use or operation of the Phase III Equipment for the term of the

K&E 11095304.1

Phase III Agreement including all license and registration fees, and all sales, use, personal property, excise, gross receipts, value added, franchise, stamp or other taxes, imposts, duties and charges, and any penalties, fines or interest thereon.

118. The Phase III Agreement requires the Plaintiff to maintain "All Risk Property Insurance" with coverage in the greater of the then current Stipulated Loss Value, i.e. an amount equal to the remaining "rent" under the agreement, or replacement cost value in an amount acceptable to GECC, "Business Interruption Insurance," "Comprehensive General Liability Insurance," "Workers' Compensation/Employer's Liability" insurance and "Excess/Umbrella Liability" insurance in accordance with the amounts and terms set forth in the Phase III Agreement.

119. The Phase III Agreement requires the Plaintiff to bear all risks of any loss, theft, damage to, or destruction of the Phase III Equipment from any cause and the occurrence of any loss, theft, damage, loss of possession, use or destruction of the Phase III Equipment shall not relieve the Plaintiff of any obligation under the Phase III Agreement.

120. The Phase III Agreement requires the Plaintiff to indemnify GECC against, and hold harmless from, any and all claims, actions, suits proceedings, costs, expenses, damages and liabilities, arising out of, connected with, or resulting from the Phase III Agreement and the Phase III Equipment.

121. The Phase III Agreement disclaims all of GECC's warranties, express or implied, including, but not limited to, warranties of merchantability or fitness for a particular purpose or otherwise.

K&E 11095304.1

122.     The Phase III Agreement requires the Plaintiff to bear all costs relating to any searches undertaken by GECC, or any filing, recording, stamp fees or taxes arising from the filing or recording of any such instrument or statement.

123.     The Phase III Agreement requires the Plaintiff, at its sole expense, to maintain, service, test and inspect each unit of the Phase III Equipment and keep it in good operating order, repair, condition and appearance in accordance with the manufacturer's recommendation, normal wear and tear excepted.

124.     The economic realities of the terms of the Phase III Agreement are that GECC does not retain any meaningful residual interest in the Phase III Equipment upon the expiration of the original term of the Phase III Agreement.

125.     At the inception of the Phase III Agreement, GECC did not have a meaningful expectation that it would ever take possession of the Phase III Equipment upon expiration of the term of the Phase III Agreement.

126.     The terms and obligations of the Phase III Agreement and the nature of the equipment covered by the agreement economically compel the Plaintiff to purchase the Phase III Equipment.

127.     The Phase III Agreement is a financing agreement that creates a security interest and not a true lease.

WHEREFORE, the Plaintiff requests that the Court enter judgment granting the following relief:

(1)     a declaration that the Equipment Agreements executed between the Plaintiff and the Defendant are financing agreements that create a security interest and are not "true leases;"

22

(2)     a declaration that the Plaintiff is the owner of the Phase I, II and III Equipment and any orders, stipulations or otherwise granting relief contrary to this ruling be vacated to the extent they are inconsistent with the Plaintiff's ownership rights;

(3)     a declaration that, notwithstanding any orders, stipulations or otherwise granting relief contrary to this ruling, the Plaintiff may exercise any and all ownership rights with regard to the Phase I, II and III Equipment, including the ability to sell such equipment;

(4)     directing that the Defendant immediately disgorge to the Plaintiff any amounts paid by the Plaintiff to the Defendant after the Petition Date under any Equipment Agreement, whether pursuant to order, stipulation or otherwise; and

(5)     such other and further relief, at law or equity, to which the Plaintiff is entitled.

Dated:  April 19, 2006

**KIRKLAND & ELLIS LLP**

*/s/ Ray C. Schrock*
Richard M. Cieri (NY RC 6062)
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

-and-

David L. Eaton (IL 3122303)
Ray C. Schrock (IL 6257005)
Amy A. Hijjawi (IL 6201301)
200 East Randolph Drive
Chicago, Illinois  60601
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

-and-

**CARSON FISCHER, P.L.C.**

Joseph M. Fischer (P13452)
4111 West Andover Road
West - Second Floor
Bloomfield Hills, Michigan 48302
Telephone:  (248) 644-4840
Facsimile:  (248) 644-1832

Co-Counsel for the Debtors

24

## <u>CERTIFICATE OF SERVICE</u>

I, Ray Schrock, an attorney, certify that on the 19th day of April, 2006, I caused to be served, by **first class mail**, in the manner and to the parties set forth on the attached service lists, a true and correct copy of the foregoing **Complaint** and **Summons**.

Dated: April 19, 2006

*/s/ Ray C. Schrock*
Ray C. Schrock

| CREDITOR NAME | CREDITOR NOTICE NAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Akin Gump Strauss Hauer & Feld LLP | Michael S Stamer Philip C Dublin | 590 Madison Ave | | New York | NY | 10022 |
| Butzel Long PC | Thomas B Radom | 100 Bloomfield Hills Pkwy Ste 100 | | Bloomfield Hills | MI | 48304 |
| C T Corporation | | One Commercial Plz | | Hartford | CT | 06103 |
| Dykema Gossett PLLC | Ronald Rose | 400 Renaissance Center | | Detroit | MI | 48243 |
| Latham & Watkins LLP | David Heller & Josef Athanas | Sears Tower Ste 5800 | 233 S Wacker Dr | Chicago | IL | 60606 |
| Simpson Thacher & Bartlett LLP | Peter Pantaleo & Alice Eaton | 425 Lexington Ave | | New York | NY | 10017-3954 |
| Stephen E Spence | US Trustee | 211 W Fort St Ste 700 | | Detroit | MI | 48226 |
| The Corporation Company | | 30600 Telegraph Rd | | Bingham Farms | MI | 48025 |
| The Corporation Trust Company | | Corporation Trust Center | 1209 Orange St | Wilmington | DE | 19801 |
| Third Avenue Trust on behalf of Third Avenue Value Fund Series | co David Barse | 622 Third Ave 32nd Fl | | New York | NY | 10017 |
| Wachtell Lipton Rosen & Katz | Hal Novikoff & Chetan Gulati | 51 W 52nd St | | New York | NY | 10019 |

In re: Collins Aikman Corp., et al.
Case No. 05-55927 (SWR)

1 of 1

4/18/2006
3:59 PM

06-04573-swr    Doc 1    Filed 04/19/06    Entered 04/19/06 20:41:01    Page 26 of 26